Good morning, Your Honors. Thomas Boyd here on behalf of the Appellant Inline Packaging. The parties to this appeal manufacture and supply susceptor food packaging products. Graphic controls 95 percent of the susceptor business in the United States by dominating the sales to five major customers who purchase over 90 percent of the packaging products in this country. Inline is currently Graphic's only viable competitor for these major customers. But Graphic has deliberately and aggressively campaigned to maintain its 95 percent monopoly and exclude Inline from competing for the business with these customers by using a variety of anti-competitive means. Those include falsely claiming to be the sole inventor of certain susceptor packaging design concepts, sham claims for patent infringement on invalid patents, bundled discounts that effectively price the competitive segment of the susceptor business to these major customers below cost, and long-term exclusive supply contracts that bar Inline from competing for 85 percent of these customers' business. Mr. Boyd, what's the current status of the patent case? It's my understanding that that case, having been stayed, resumed and went through fact discovery, and I believe fact discovery is either close to ending or has ended, and they're going to move on to the expert phase of that case. I'm not personally involved, but that's my general understanding. There was an opinion and order just a few days ago, huh? October 1, there was an opinion and order in that case? Again, Your Honor, I'm not directly involved in that case. I'm embarrassed to say I'm not aware of that. No, that's okay. All of our claims are alleging anti-competitive conduct on behalf of or by Graphic. Some of those are patent-related. Others, as I mentioned, are bundled discounts and exclusive supply agreements. I'd like to briefly address the patent-related claims and then move on to the others. Inline has established its Walker process claim. The factual evidence in the record, as well as Inline's expert, Alan Kowalczyk, have established that Graphic knowingly and willfully procured the asserted patents by fraud on the patent office. Don't you have to show that by clear and convincing evidence a co-inventor? We have to demonstrate by clear and convincing evidence willful intent to defraud. I thought you had this clear and convincing evidence you had to prove the co-inventor under our Jim Starr case. Tell me if I'm wrong. Certainly, Your Honor. Our position is the evidence demonstrates the individual who claimed to be the inventor is not the inventor, is not an inventor. But even if there were support for that proposition, the clear and convincing evidence demonstrates that it was a collaborative process, so Graphic and Fitzwater cannot claim to be the sole inventor. Didn't Nestle's main witness not suggest that he was a co-inventor? That's incorrect, Your Honor. He provided facts that effectively defined his own role, his role in 2001 as well as 2005 in this collaborative process, to be at the very least a co-inventor and that his colleagues were co-inventors. He was asked these questions years after the fact. He was not familiar with what the legal definition of inventor is, and so he didn't affirmatively say, I'm the inventor. But his words, the content of his description of his involvement establish that he and his colleagues were at the very least co-inventors. They directed Fitzwater. Heap Bauer was involved in the 2001 development of the concept that was the starting point for the subsequent 2005 activities. Those activities were subject to a joint development contract. All of this evidence is, I would say, in excess of clear and convincing evidence, demonstrating that it would be false, it would be willfully defrauding the U.S. Patent Office to claim sole inventorship and exclude Bauer or Nestle and their involvement. That had to be disclosed to the Patent Office, and they failed to do that, and we believe that a jury could readily find that by clear and convincing evidence to be fraud on the Patent Office. They also failed to disclose prior sales, and that too, as a separate matter, supports our Walker process claim. The district court ignored all these facts and instead applied, created, and applied a rule from Pro Mold, a Federal Circuit case, that is readily distinguishable from the facts in this case. But she ignored the facts and instead determined that we could not proceed with a claim unless Mr. Bauer or someone else affirmatively asserted inventorship. That's not the law, and it never has been. In Pro Mold, there was no evidence of active collaboration. In Pro Mold, there was no prior concept that had been developed by another party. So what was the proof for prior sales? Excuse me? What was the proof for prior sales that was... Oh, prior sales? It's undisputed that Graphic made prior sales on this, the 2001 concept that was the starting point for the patents that were later sought in 2005. Those are undisputed facts. It's design... This is the design samples? Yes. Don't you have to show on that that the design samples were the same as the limits of the final patent? I don't believe we do. Well, I thought you had to compare the design samples to what's in the patents and their claims and see if there's obviousness and they got the same limits. Tell me if I don't understand it. Well, perhaps I'm having a disconnect here. I would refer to our patent expert, Mr. Kowalczyk, who addressed that and who indicated that those prior designs were subject to or were included in the application that was subsequently patented. Okay. From reading the characterization in your briefs of these prior sales, it seems to me that they could be characterized more as experimental rather than commercial. They're a very small amount, very small dollars. What's wrong with that? Well, that may be something that people could debate about, but there's absolutely no question those were things that the patent examiner would want to review. First of all, I would reject the relevant as prior sales, but secondly, at the very least, they had to be disclosed. The examiner could not access that information otherwise, so it was fraudulent and it was improper concealment to not disclose those to the patent office. Moving on quickly to sham litigation, there the court erred, the district court erred, by simply characterizing those claims as a completely separate claims with an entirely different standard. Your adverbs there, I think, gave you away. You don't mean completely, completely. Not completely in terms of the facts known, the facts that GRAPHIC knew when it made these sham threats and commenced the sham litigation. They knew facts that demonstrated these were not valid patents because they knew facts showing that Fitzwater was not the sole inventor and that there had been these prior sales, but the judge, the district judge, treated them as Walker Process, applied the Walker Process standard. That was entirely incorrect. The standard is whether it's objectively baseless to assert these are still valid patents, and we clearly established that to be the case, and that is at the very least a triable issue that should have gone to the district court, or excuse me, to the jury. Moving on to the bundling and the exclusive supply, the bundled discounts and the exclusive supply agreements, I want to start by emphasizing those are separate claims. The court treated them as if they were the same and applied the appropriate test to examine the bundled discounts. That was an inappropriate test to apply to the exclusive supply agreements, which on their face expressly provide for exclusivity. So it's de jure exclusivity. The appropriate standard is the rule of reason analysis. Is the exclusive dealing in your complaint? Yes, it is. We expressly assert that those all requirement contracts are violations and are anti-competition. More importantly, everybody in the case understood that we were asserting those as Section 2 Sherman Act violations. That was litigated. It was discovered as part of our accounts 3 and 4. They were squarely addressed by the experts. There was never a determination by the judge, by the district judge, there was some kind of prejudice because it hadn't been adequately pleaded, and I would say there was never any assertion, let alone proof, by a graphic that it had been prejudiced by way of how it had been pleaded in the complaint. So that was squarely within the case throughout the entire lawsuit. Inline has properly proved that it has a triable bundling claim in this case. The district court improperly construed this case or this claim, the bundle claim, as if it were a tying claim. And that was a mistake primarily because the district court then required that our expert and my client demonstrate that there was monopoly power in the leveraged market, specifically paperboard. That is not a requirement for a bundling claim. That's only a requirement for tying, and the cases cited by the district court to impose that requirement were all tying cases. Mr. Levinson, Professor Levinson, referred to market power, but it's clear in his report as well as in his deposition, he was referring to sufficient margins to be able to cross-subsidize the discounts in the susceptor market. So that was proper for him to do, and it was proper for him to rely on the margins, margin data to do so. In applying the discount attribution, Professor Levinson also took into account the contestable sales in the competitive product market. That has been a bone of contention in the briefing, but interestingly in reviewing the record as well as the expert reports, the record well supports the proposition that you must include contestability as part of the test. That's important to determine what is the actual competitive product. It would be inappropriate to simply assume a customer would be willing to switch 100 percent of their sales to a new entrant or a non-incumbent supplier. So you have to take that into account. That's entirely appropriate. All of the scholars, well I won't say all of the scholars, I realize categorical is I was ready, I was ready for that. Go ahead. Many, many of the scholars, it's well, it's well accepted that that would be an appropriate approach. But if you get that part of the market very, very, very, very skinny, then you can easily prove any claim. Well, you can't just make it when you, I'm sure you've already done this, but when you go back and review the expert reports from Levinson and Saravia, their dispute is not over whether you take it into account, it's how skinny, whether it's 20 percent, which our expert says that's conservative. It's really much lower when you look at all of the data points, our experience, what the customers have said, and what Saravia says, no, it's really more like 40 percent. So it's that debate over what the facts demonstrate that is the difference, not whether or not it's relevant and appropriate to take that into account in applying the discount attribution test. Does this become kind of an issue of law where a court off the beginning, it's not really a material issue of fact, but it's really an issue of law to say, well, this economic theory, so to speak, governs, and this one doesn't, and it does, it's not really a true genuine issue of material fact, because I think that all of you basically agree on the economic facts. Well, let me take that in two pieces. To begin with, it's not a question of law, because as you said, the parties agree the discount attribution test is the appropriate test. Now, the district judge went further to say, well, you know what, I can see how contestability may be appropriate in some cases, but I just don't think it should apply here. Without explanation, only commentary about why from a policy standpoint she doesn't like, the court doesn't like contestability. Well, what if she simply said, I don't believe this expert, I believe that expert, Dawbert, out of here. Well, those are two different things. What she did was pick an expert, but she did so inappropriately. It's for the jury to determine which expert is more credible and compelling. That's the factual issue that the jury will decide. Now, in terms of Dawbert, there was no Dawbert proceeding. She did not go through Dawbert. Had she done that- Did either side mention Dawbert? Did either party mention Dawbert? Yes, I believe Dawbert motions were pending, and she denied those as moot. She granted the summary judgment motion and didn't address those. Thank you. But recognize, and I realize I'm into my rebuttal time, so I'll just wrap up, but finishing up the response to your honor, to all of you, with regard to Dawbert, that would have to, that would require a review of this area of economics. And such a review, while there may be a debate here and there, such a review would establish that Levinson's application of the discount attribution test was sound and in conformity with established economic theory. Outside of the commentary- Real quick, has any court adopted the contestable share variant of- In our view, PeaceHealth did so, at least implicitly, when it required that the entire bundled discount be attributed to the competitive product. Again, economists can't just assume a customer would switch 100% of their business. So PeaceHealth, at least implicitly, if not expressly recognized, you have to determine how much of that business is competitive. So I would say the Ninth Circuit, and then the Justice Department, the scholars, even Judge Montgomery said, in appropriate circumstances, that's relevant. It just seems pretty loose to predict how much is contestable, you know? Actually, not in this instance. We certainly understood how much market, or how much business we could contest for. Graphic, who controlled, without Inline being in the business, Graphic controlled 100%. So they knew very well what was contestable, because they knew their 100% went down to 94%. So they, it's not loose, it's well based in the record, and there's the contestability here. Thank you, Your Honors. Thank you, Mr. Boyd. Mr. Hamilton. Not quite as tall as Mr. Boyd. Good morning, Your Honors. May it please the Court. My name is David Hamilton, and with my partner, Jason Hicks, we represent the Apple League Graphic Packaging. First, I'd like to make a couple preliminary comments. One is that I'm prepared to answer all the questions you ask, Mr. Boyd, and those are probably more interesting than my presentation, so I'm happy to answer your questions. I would also note that in response to Judge Benton's question, the October 1 opinion was a claims construction opinion, and the Apple League Graphic Packaging prevailed in that. I noticed that. Go ahead. One critical thing that Mr. Boyd overlooked, and that is a theme that is very important for purposes of this case, and that's there's been no proof of harm to competition, and that comes in two respects. Inline never proved in the district court either harm to competition as a result of the pricing practices by graphic or by the patent practices. That alone is sufficient reason to affirm summary judgment. Mr. Boyd also did not address the tortious interference claims. I may not be able to do that. I'd like to come back, but I'd point out that Judge Montgomery made short work of those tortious interference claims. I hope to be able to address the patent part of the tortious interference claims. The case, though, underscores the need to apply rigorous and specific standards to antitrust and patent claims to challenge lawful competition and innovation. On this record, Judge Montgomery adopted a pragmatic, a pretty lean approach for sure, but we agree with that approach because it highlights that Inline failed in the basic elements and fundamental concepts or failed to produce evidence that was sufficient as a matter of law that summary judgment was appropriate. Inline alleged an antitrust violation and tortious interference. The antitrust claim has two parts, two predicates, pricing practices and patent practices. I'd like to address the pricing practices first. These are the fundamental elements on which there's been a failure of proof by Inline. First, I'll say harm to competition. That is enough to sink the Inline ship here. As Judge Montgomery concluded, Inline failed to produce any evidence of harm to competition, which since Pueblo-Bolomat and as adopted in this court in Concord Boat has been a necessary element of a Section 2 claim. They're about to put a competitor out of business, and you have monopoly power in there. I don't understand your harm to competition bottom line. Well, putting a competitor out of business is not harm to competition. That's a backwards looking way of looking at the market, but more importantly, the traditional measure of harm to competition is about competition. It's not about putting a competitor out of business. In fact, I'll go forward a bit. At best, what Inline established was harm to itself, which is not sufficient to establish harm to competition. The traditional measures of harm to competition include things like reduced output, of which there was no evidence, reduced quality, of which there was no evidence, and increased prices. In fact, just the opposite... You said increased price last. Go ahead. I'm sorry? You said increased price last. That should be first, but go ahead. Okay. I don't mind your order, Your Honor. In fact, on that issue, the expert for Inline showed that but for the discount pricing practices of Graphic, the prices would have been some percentage higher. I don't remember what it was, 40% or something like that. Another important point is, and we disagree with Inline on this, is that it offered no proof of monopoly or substantial market power. It's going to be dangerous to try and interpret the Southeast Missouri Hospital case back to Your Honor because you wrote the opinion, but I think I'm going to come back to that in a minute. Monopoly power is a stated element of a Section 2 claim. The concession that they didn't establish market power was obtained willingly from the expert, Levinson, who said that he didn't need it to form his opinion. And again, he had a backwards-looking view of the market rather than an attempt to go through on an element-by-element basis a traditional analysis of a monopolization claim. Judge Montgomery added that proof of market power and paperboard, which is the leveraging market, which is appropriate in a discount bundling claim, is fatal to bundling claims because an essential element of unlawful bundling is coercion, part of market power. It's part of what you have to establish in a Section 2 claim. Now, you've not had a chance to reply to their chart on page 19 of their reply brief, which does address this very issue you're talking about. Do you have a short explanation or you want to make a long explanation? Is this the pricing chart? Yeah, simplified margins example. Right. On the pricing practices, I think my response is we have a different view of what is the appropriate test. On the pricing practices, there is no evidence at all that graphics pricing was below average variable costs, which was the test in Concord Boat and in Southeast Missouri Hospital. Now, this Court has not adopted yet the Peace Health discount attribution test, but if it does, Inline fails that test too for opposite reasons for what Mr. Boyd said. Rather than properly conducting the discount attribution test, it misapplies the test in a way not recognized by any court, to your Honor's point. Levinson's result-oriented contestable shares test violates an important point, thus Safe Harbor. Out of Peace Health, what you get is a criticism of prior case law in LePage's because there was no way to predict, as a competitor, whether your pricing practices were inbounds or not. And so an important line of antitrust policy in the cases of Book Group, Linkline, Concord Boat, and Peace Health is, there's two things. One is cost cutting is pro-competitive. It's the essence of competition. And second, manufacturers deserve to have a safe harbor, knowing whether their prices are inbounds or not. To respond to one of your Honor's points, if you have a Levinson test, in any given case, he can skew it whichever way he wants. He can skew it to 10 percent. He can skew it to 40 percent. He could skew it to 80 percent. Graphic doesn't know how the expert is skewing it. Graphic doesn't know what its rivals' costs are. Yeah, but Graphic has an expert, and your expert agrees. At some point, there is a limit about how much they can contest, you know, capital and access to markets. There are all kinds of other factors. Right. So you agree that there is some part of this contestable and some part that's not, right? Dr. Sarabia was responding to Dr. Levinson's report and disagreed with the math. And it's probably not a good thing for me to do math at the podium, but disagreed in concepts as to the amount that was appropriate for contestable shares. And what she was responding to is what actually happened in her analysis or her analysis of the rebuttal of Dr. Levinson. She didn't agree necessarily that the contestability shares test was an appropriate test. Of course. But she does agree there's a limit on the contestable amount of the market when you've been in business and you've been controlling the market. Right, but then we're subject to other tests like harm to competition. So, you know, again, the overall theme here is, although it's analyzed at the back end of an antitrust case, here because there's been no harm to competition offered by Inline on either the pricing practices or the patent practices, we have alternative independent reasons to affirm summary judgment. I'd like to turn last to the exclusive contract issue. The court probably knows that Judge Montgomery excluded that as untimely. To answer Your Honor's question, it was not pled in the complaint. We did not have a chance to move to expert reports. It was not part of Inline's motion to amend their complaint to add punitive damages, and it was sprung on us as a response to our summary judgment motion. And this court, I think, has adopted the test that under the circumstances it would be inappropriate to consider a theory like that. Judge Montgomery did go the next step, though, and say even if we do, if Judge Montgomery considers the exclusive contract test, the Inline calculation failed the price-cost test established in the Third Circuit in the ESI and the ZF Meritor test, meaning that even if there is an exclusive contract, it has to satisfy a price-cost test, and it didn't. There was no evidence offered by Inline that it did. The third point there is, although this was not in the opinion, the contracts are not exclusive. And the best evidence of that for me and for the court is probably Appendix C to Dr. Saravia's report, where she goes through on a contract-by-contract basis an analysis of the various terms that are part of the contract. And in each of the contracts, there are so many escape hatches that they become effectively what was rejected in the Concord Bow test, a rejection of a de facto exclusionary contract because the customers can walk away. They can walk away from new products. They can walk away from new packaged products. They can walk away from certain terms and certain prices. And indeed, there's even evidence in the record, the CEO of Graphic testified, and this is found at AA351. Mike Doss, who is the CEO, said, I hate all these terms because it essentially renders the contracts meaningless. The contracts that were negotiated between Graphic and its customers included negotiating contracts way before the terms ended. Right after the ink was dried, the customers began negotiating new contracts. And so part of the theme in this case is what drove all of the pricing practices and indeed responding to the patent needs of Nestle were the customers. The customers demanded these terms. It was not as though Graphic has a monopolization over its customers. I think that it's an important point here. In the record, there are a number of affidavits from Graphic people, but also the customers from Schwann's and Conagra and Pinnacle, as well as some affidavits from Nestle. But they all point out the fact that we, the customer, control what happens in these contracts, not you, Graphic. In this market, this Scepter market, was there any discussion by your experts of how many buyers there were? I know Nestle's there. Tell me if I'm wrong and a couple of others. You mean the CPGs, the consumer packaged goods? Yes. In the paper board market, there's one answer. In the Scepter market, there's a different answer. I want the Scepter answer. Well, in the Scepter market, there's evidence that obviously Graphic is a dominant firm. Inline is also a participant. And if you look at the testimony. I'm talking about the people that they're selling to. I tried to use Nestle as an example. I thought there were five total by Scepter. Oh, yes. Yes, Conagra, Schwanz, Pinnacle, Heinz, Kraft Heinz at the time, and then Heinz and Nestle. But how about their market shares? Is there evidence, a record, that one of them has a tremendous percent or two of them have 60 percent? I am not going to be able to give you a definitive percentage answer, but I think Nestle is the biggest purchaser of Scepter. It's in the record. I'm asking if it's in the record. Do you think this is in the record somewhere? Yes. We'll find the patent claims. The claims have two predicates there. Walker process fraud and sham litigation. The court pointed out that the standard for proving Walker process fraud is very high. Proof required is knowing a willful fraud in attaining a patent. Inline never made it that far because they were unable to prove through the lens of claims of false inventorship or inequitable conduct that standard. Judge Montgomery concluded that Inline failed to reach the trans web and the Theracense standards, which are the prototypes for trying to set forth an inequitable conduct claim. The proof for inequitable conduct, when it's based on false inventorship, is that there must be clear and convincing evidence of deliberate intent to withhold a known material reference and the intent to deceive must be the single most reasonable inference. Pretty high standard. You have to prove both inequitable conduct and then the Walker process fraud claim. Theracense talks about, and so does trans web, that the standards are almost identical, but Inline has contested that. If they want to contest it, that's fine because the Walker process fraud standard is actually higher than the inequitable conduct standard. But at the trial level, there was no evidence of intent to deceive the Patent and Trademark Office on inventorship. In fact, the evidence is that Graphic identified the one and only proper inventor, Kelly Fitzwater, of the susceptor sleeve in the 078 patent. Judge Montgomery concluded that Inline was unable to identify a co-inventor and the proof actually included a disclaimer from Mr. Brower, who was referenced earlier, and an affidavit from Lou Judge of Nestle disclaiming that anybody at Nestle was an inventor. In fact, the testimony for Mr. Judge is found at A836, Mr. Brower at A136. Question at line 22 of the deposition transcript to Mr. Brower, do you consider yourself an inventor of the Roxanne patent specifically? Answer, no. And so for a disclaimer, like the ones that were obtained from Chef America's employee who became the Nestle employee, Mr. Brower, and from Mr. Judge, it fails the pro-mold and the established as a matter of case law, but I think it's a reasonable interpretation that Inline's failure to provide a claims analysis means full stop under the Gemstar and Trovan standard that Graphic's entitled to summary judgment. This is not addressed by Judge Montgomery. But under Gemstar and Trovan, inventorship or conversely lack of inventorship have to be determined on a claims-by- rather than provide a claims analysis, which Graphic did. Graphic's claims analysis showed that Fitzwater was the inventor. But rather than supply a claims analysis, what Inline did was conduct a bunch of random events to argue a key concepts approach, which is inadequate as a matter of law. That evidence does not show how Nestle contributed to the conception of the claim. There's a memo that has been discussed extensively and relied on extensively by Inline, and I'd just like to highlight it. It's a memo that was dated June 2001, and it was written by Corey Brower, who at the time was from Chef America, founded APP 683-684. It's two pages, but it's no more than just a summary memo of the topics discussed at the meeting. There's no attribution of who made suggestions, there's no to-do list, and because there's no claims analysis, there's no link to the 078 patent. There's no way to determine at all whether any of the topics discussed in that memo became part of the invention. And so that's one of the events, random events, that Inline tries to connect up, but it's an exaggeration to say that this memo is evidence that proves inventorship or shows that Graphic had intent. Remember, the very high standard under Walker process fraud and inequitable conduct. No evidence at all to show that Graphic had an intent to trademark office. I'd also point out that between 2001 and 2005, which is when the new joint development agreement was signed between Nestle and Graphic, that Nestle had acquired Chef America. So you have a series of events where in 2001, the designs that were shown to Chef America were rejected. 2003, Chef America gets acquired by Nestle. 2005, the parties sign a new joint development agreement. I think that at a minimum suggests that there's no intent to deceive the patent trademark office, but rather enter into a new agreement to talk about new samples. So I think that in addition to the fact that there's been no proof of co-inventorship, you have external events that prove that Graphic was pursuing a patent in 2005 and 2006, and it had the sole inventor, Kelly Fitzwater, identified in its provisional and non-provisional applications to the patent trademark office. I think Judge Benton, you asked a question about materiality and prior sales. So one of the questions here is whether there's been any evidence of intent to deceive the patent and trademark office by withholding the sale of material prior art. The only way that arises is with a person that has a duty of candor. There were three people identified as potentially having a duty of candor. Mr. Biddle, who's in-house counsel, Kelly Fitzwater, the original inventor, and Mr. Voisey, who was the sales guy, if you will, for the team. Biddle may have had the duty of candor, but had no knowledge of the prior sales because he was not with Graphic at the time. Kelly Fitzwater may have had a duty of candor, but she had no knowledge of the prior sales or the materiality of the prior sales. Arguably, Voisey, who might have had a duty of candor, knew of the 9001D1F sample that was shown to Nestle. What he didn't know, and what Inline was unable to establish, was he knew about the sales, but he neither knew that they were material or prior art. And the reason for that is he was not involved in the patent application process. His testimony at APP 658 was in his deposition. I was not involved in the process to see if they were patentable. On a sham litigation claim... Going back to that, could we also affirm on the basis that these prior sales were experimental rather than commercial, and therefore not material? Your Honor asked a question about the amount and the population, if you will. I think it was 500 samples and the amount was $3,200. I think they were samples and they were rejected. So to your point, yes, I would agree with Your Honor's characterization of that. On appeal, Inline argues that Judge Montgomery must be wrong in her conclusion that Inline's proof of sham litigation is a recycled version of the Walker process fraud claims, and that that must be wrong as a matter of law. Just the opposite is true. Inline is wrong. Inline only argued from the same set of facts about graphics patent practices concerning the 078 patent. The Noble Pharma case, a Federal Circuit case from 1998, establishes that the same set of facts can form a basis for sham litigation or Walker process fraud. They didn't argue anything different when they argued sham litigation than when they argued their Walker process fraud claim. And so the record has nothing other than the good faith of graphic filing a suit on a validly issued patent. When the patent was issued, nothing post-prosecution was learned by graphic that suggested that it was not a valid patent. And so filing a suit on a patent is an immunized act under the test that was established in this court, the Federal Circuit Court in Matthews. Again, a notorious interference claim, the assertion first comes out of the patent rights that there were, because graphic asserted its patent rights that by sending emails and had protectable patent rights, that those are not only lawful, but they're encouraged. There's a case from the District of Minnesota. I don't think it's a Judge Montgomery case, but it's the Sleep Comfort case that says that when you're doing this and you've got a legally protected interest, you're notifying the parties that they might be doing something wrong. That's a smart thing. We encourage that as a matter of law. I see there it is, Your Honor. May I make one last point? No. Pardon me? No. Okay. Thank you, Your Honor. Mr. Boyd, your rebuttal. Thank you, Your Honor. I'll try and be very precise. First, with regard to the sales, experimental versus commercial, it doesn't matter. That wasn't addressed below or briefed, but my colleague indicates it was addressed by the Supreme Court last term in a case called Helsin. I believe it's H-E-L-S-I-N-N. But they have to be material enough to render the claim unpatentable, right? They have to be what? They have to be material enough to render the claim unpatentable, right? That's right, Your Honor. We believe it is. At the very least, it's a fact question. You just heard a rendition of graphics version of the facts. Those are all triable facts. With regard to the claims analysis, Kowalczyk, our expert, performed a claims analysis. He also explained why Voisy had a duty of candor. With regard to the application of the price-cost test, that does not apply to the exclusive supply agreements. That is de jure exclusive. Those are not de facto claims. It's de jure, and therefore it's rule of reason. The District Court failed to apply that. With regard to your inquiry, Judge Benton, regarding how to find the information about the sales and the majors, look to Levinson's report, Appendix 315 to 324, particularly his exhibits. My clerk thanks you. Proceed. Thank you. With regard to antitrust injury, there is a myriad of information and evidence regarding the antitrust injury here. I would start with the most significant, and that is graphics margins in Susceptor. They are three times higher than their margins in Paperboard. The difference? They have competition in Paperboard, no competition in Susceptor. Clear harm to the market and the customers. That's in addition to everything else that's in our experts' report, as well as in their own antitrust competition manual saying stay away from those kinds of exclusive agreements. With regard to their assertion that our expert opined that if we compete, prices go up, that's flatly wrong. They cited to Don Garowski, not our economist, and Don Garowski, who's not an economist but instead an accountant, asserted that we would be able to compete for the more complex, higher-priced products. Not that prices would go up, but to compete for that more lucrative business. That's what competition is about and that's what we could bring. With regard to the discount attribution test, something I didn't have time to address this particular point. Contestability is essential to that test, but even if you ignore it, our experts said some of these supply agreements still fail, the Heinz agreements in particular. Thank you so much for your patience and your time this morning.